UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:18-cv-00518-FDW

| | |
|---|---|
| AVERY J. LAIL, JR.,               ) | |
|             ) | |
|     Petitioner,          ) | |
|             ) | |
| vs.                      ) | **ORDER** |
|             ) | |
| ERIK A. HOOKS, Secretary,[1]      ) | |
| N.C. Dep't of Public Safety,      ) | |
|             ) | |
|     Respondent.         ) | |

**THIS MATTER** is before the Court upon pro se Petitioner Avery J. Lail, Jr.'s Petition

for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254 (Doc. No. 1) and Respondent's Motion

for Summary Judgment (Doc No. 7).

## I.    BACKGROUND

Petitioner is a prisoner of the State of North Carolina, who, on September 28, 2015, in the

Superior Court of Gaston County, was convicted after trial by jury of second-degree murder.

The North Carolina Court of Appeals provided the following summary of the evidence

introduced at trial:

> Just before 10:00 p.m. on 23 March 2014, Brian Dale Jones was found dead on a
> driveway located on Old Dowd Road in Mecklenburg County. His head and face
> had been beaten and bruised, his neck cut and stabbed repeatedly by a knife, and
> his right internal jugular vein severed. The autopsy on Brian's body revealed that
> he was extremely intoxicated at the time of his death, his blood alcohol level

---

[1] Rule 2(a) of the Rules Governing Section 2245 Cases in the United States District Courts requires that ". . .the
petition must name as respondent the state officer who has custody." North Carolina law mandates that the
Secretary of the Department of Public Safety ("DPS") is the custodian of all state inmates, and he has the power to
control and transfer them. See N.C. Gen. Stat. § 148-4 (2017) ("The Secretary of Public Safety shall have control
custody of all prisoners serving sentence in the State prison system . . . ."). Accordingly, Erik A. Hooks, current
DPS Secretary, is the proper Respondent in this action.

registering at .43 on the breathalyzer scale, but that he died of blood loss from his knife wounds.

On 11 April 2014, Mark Huntley, defendant, and Joyce Delia Rick were arrested in connection with Brian's death. The three had been living together in Joyce's home for a few weeks before Brian arrived uninvited at Joyce's door on the night he died. During interviews with police, the three gave statements concerning the events surrounding Brian's homicide. On 21 April 2014, defendant was indicted on one count of first-degree murder. From 14 to 25 September 2015, defendant was tried in Gaston County Superior Court. The State's evidence generally established the following facts relevant to which malice theory supported the jury's verdict.

Mark testified that he witnessed defendant murder Brian with a butcher knife. According to Mark's testimony, on 23 March 2014, he, defendant, and Joyce were in Joyce's living room watching a NASCAR race on television. Around 1:00 p.m., defendant and Mark began drinking. A few hours later that evening, Brian arrived at Joyce's home driving a green car belonging to Brian's girlfriend, Susan Braddy. Mark had previously dated Susan. Mark had met Brian a few times before and the two had gotten into an altercation about Susan once before at a convenience store. Brian brought with him a Duke's Mayonnaise jar full of moonshine, which he shared with defendant and Mark. Over the next hour or so, the four of them hung out and talked. Joyce did not drink. Mark took a few swigs of the moonshine, but defendant and Brian drank most of it. Defendant and Brian also smoked crack together.

Once the moonshine was finished, Brian, heavily intoxicated, slurring his words and barely able to stand, started to leave Joyce's home in an attempt to drive home. Defendant tried to persuade Brian to sleep on the couch and sober up before driving but Brian refused. Defendant then helped Brian stumble outside to Susan's car and crawl into the vehicle. Mark followed. From outside the car, defendant continued to encourage Brian not to drive. Mark remained outside for a few minutes but then went back inside Joyce's home.

When Mark returned outside a few minutes later, he noticed that Brian had backed Susan's car into the driveway and defendant was standing at the driver's side window continuing to argue with Brian. The argument turned into a fight, and defendant began punching Brian through the car window. Defendant then opened the driver's side door, pulled Brian out of the vehicle, and began punching, kicking, and stomping him. Mark grabbed defendant from behind and tried to stop defendant from beating Brian, but defendant hit Mark in the head and then continued to beat a defenseless Brian. Defendant, standing on Brian's chest, stopped hitting Brian and then declared that he would be right back. Defendant went inside Joyce's home and returned outside wielding a butcher knife with an eight-inch stainless steel blade. Defendant got back on top of Brian's chest. Mark asked defendant what he was doing. Defendant replied: "I'm gonna kill him" and

then cut Brian's throat two or three times with the butcher knife.

Defendant threatened to kill Mark if he did not help dispose of Brian's body. At this point, Brian was still alive but bleeding profusely, and the only sound Mark heard from Brian was "the gurgling of the blood in his throat and lungs." After an unsuccessful attempt to load Brian's body into Susan's vehicle, defendant and Mark loaded him into the back of Joyce's minivan. Defendant drove the minivan, and Mark followed in Susan's vehicle. At one point, Mark noticed Brian's arm dangling out of the back window and got defendant's attention. The two pulled over, loaded Brian's arm back into the minivan, and then continued driving. Brian was eventually dropped on Old Dowd Road in Mecklenburg County.

Defendant and Mark then returned to Joyce's home, changed clothes, and started for South Carolina in Susan's car, leaving the minivan and without cleaning any of the blood. Over the next few days, defendant and Mark drove to South Carolina, and then to West Virginia, before returning to Charlotte and ditching Susan's car on a road near the U.S. Whitewater Center. Defendant called Joyce to come pick them up and then the three proceeded home, where they returned to sitting around watching television as if nothing ever happened until Mark was arrested a few days later.

Joyce testified that she did not witness Brian's murder. According to Joyce's testimony, on 23 March 2014, she, defendant, and Mark were hanging around watching television in her home when she heard an unexpected knock on her door around 8:00 or 9:00 p.m. When she opened the door, she saw Brian standing there. Joyce had known Brian for about four or five years and had introduced Brian and Susan, Joyce's friend of nearly forty years, to each other about a year earlier. Brian and Susan were currently living together and dating.

Joyce invited Brian into her home. Brian returned briefly to Susan's car and retrieved a jar of moonshine before coming inside and sitting down. He shared the moonshine with defendant and Mark, and the three passed it back and forth among them as they talked. Joyce did not sip any of the moonshine but took her nightly sleeping medicine that diminishes her mental faculties. Joyce was watching television when she heard an argument develop. She was unaware who was arguing or what they were arguing about but the men started to get loud. Joyce glanced over and saw Brian slam his fist into her glass coffee table. She told Brian to leave. Brian stood up and defendant said, "Let's go outside." All three men went outside.

A few minutes later, defendant came back inside, looking angry and drunk, and told Joyce that "Brian slapped him and he kicked [Brian's] ass." Joyce thought defendant was bluffing and went down the hall to the bathroom. When she came out, defendant was no longer in her home. Joyce never saw Mark come back inside, and she never saw Brian again. Approximately twenty minutes later, defendant came back inside and told her that he was going to put gas into her minivan. About

an hour after that, Mark and defendant returned to Joyce's home, their clothes appearing wet, and the two went down the hall to change. Joyce started the washing machine and Mark and defendant put in their clothes. About thirty to forty-five minutes later, Mark and defendant left again, and Joyce did not see them for several days.

Defendant's evidence generally corroborated most of the State's evidence except for one major difference—that it was Mark who had cut Brian's neck.

Defendant testified that he witnessed Mark murder Brian with a steak knife. According to defendant's testimony, during the evening of 23 March 2014, he returned from a trip to the bathroom to find Mark and Joyce arguing with someone at the door. Joyce introduced this person as Brian, Susan's boyfriend. Brian looked angry. Defendant had never met Brian before and did not know Susan. Right after they met, Brian asked defendant if he drank moonshine. Defendant replied that he did, and Brian got the moonshine from Susan's car. Defendant returned to the couch and continued watching television as Brian and Mark started bickering. The more moonshine Brian drank, the more Brian and Mark argued about Susan. Eventually, Brian slammed his fist into the coffee table. The slam woke up Joyce, who told Brian to leave.

Mark escorted Brian outside and defendant followed. When they got to Susan's car, Mark and Brian started bickering again about Susan. Defendant stepped in between them to break up the fight. Brian backhanded defendant in the mouth, breaking defendant's artificial teeth. Defendant lost his temper and "beat the shit out of [Brian]," knocking him out and then kicking him in the face for good measure. Defendant then left Mark and Brian outside and went back inside Joyce's home. He saw Joyce and told her that he beat up Brian. About five minutes later, defendant returned outside and saw Mark kneeling beside Brian, giving the appearance that Mark was robbing Brian. When defendant grabbed Mark by the arm and pulled him back, he saw that Brian was covered in blood and that Mark had a knife. Defendant asked Mark why he had murdered Brian, and Mark responded that he had to do it for Susan. Mark then asked defendant to help him dispose of Brian's body, which he did.

After the presentation of evidence, the trial court charged the jury on first-degree murder, second-degree murder, and manslaughter, and instructed on express malice and deadly weapon implied malice but not depraved-heart malice. On 25 September 2015, the jury returned a verdict finding defendant guilty of second-degree murder, not guilty of first-degree murder, and not guilty of manslaughter.

State v. Lail, 795 S.E.2d 401, 404–06 (N.C. Ct. App. 2016). The trial court sentenced Petitioner

as a Class BI felon to 483-592 months imprisonment.

Petitioner appealed. On December 30, 2016, the North Carolina Court of Appeals ("NCCOA") filed a published opinion finding no error in the judgment, and on March 16, 2017, the North Carolina Supreme Court ("NCSC") denied his petition for discretionary review ("PDR"). State v. Lail, 795 S.E.2d 401 (N.C. Ct. App. 2016), disc. review denied, 796 S.E.2d 927 (N.C. 2017).

On December 15, 2017, Petitioner filed a pro se Motion for Appropriate Relief ("MAR") in the Superior Court of Gaston County, which was denied on May 22, 2018. Thereafter, Petitioner filed a pro se certiorari petition in the NCCOA, which was denied on August 17, 2018.

Petitioner filed the instant § 2254 Petition in this Court on September 9, 2018, see Doc. No. 1 at 14. See Houston v. Lack, 487 U.S. 266, 267 (1988). He sets forth the following grounds for relief: (1) he should have been sentenced at the B2 felony level instead of B1 because the jury did not decide this issue; (2) ineffective assistance of counsel for failing to remove jurors Petitioner believe might be biased because they had family or friends who had been murdered; (3) ineffective assistance of counsel for moving for a change of venue; and 4) ineffective assistance of counsel for failing to interview and call witnesses who would have impeached the State's witnesses. Respondent has filed a Motion for Summary Judgment seeking judgment as a matter of law on the merits of Petitioner's claims (Doc. No. 7), and Petitioner has filed a responses in support of his § 2254 Petition (Doc. Nos. 13, 13-3).

## II.    LEGAL STANDARD

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, states that a district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

§ 2254(a).[2] "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Absent violation of a Federal constitutional right, a habeas petitioner fails to state a cognizable claim for relief. Wilson v. Corcoran, 562 U.S. 1, 14 (2011) ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law.").

AEDPA limits the federal court's power to grant habeas relief. When a claim was adjudicated on the merits in State court proceedings, the federal court may not grant habeas relief on that claim unless the State court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1), (2). The "contrary to" and "unreasonable application" clauses contained in § 2254(d)(1) are to be given independent meaning—in other words, a petitioner may be entitled to habeas corpus relief if the state court adjudication was either contrary to or an unreasonable application of clearly established federal law.

AEDPA's standard is intentionally "difficult to meet." White v. Woodall, 572 U.S. 415, 419 (2014) (internal quote and citation omitted). " '[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions.' " Id. (quoting Howes v. Fields, 565 U.S. 499, 505 (2012)) (internal quote and

---

[2] Even though Petitioner is challenging the execution of his sentence rather than its validity, § 2254 applies. In re Wright, 826 F.3d 774, 783 (4th Cir. 2016) ("[W]hen a prisoner being held pursuant to the judgment of a State court files a habeas petition claiming the execution of his sentence is in violation of the Constitution, laws, or treaties of the United States, the more specific § 2254 and all associated statutory requirements shall apply[.]" (internal quotation marks omitted)).

citation omitted) (first alteration in the original).

A state court decision can be "contrary to" clearly established federal law in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." Williams v. Taylor, 529 U.S. 362, 405 (2000) (plurality opinion). "And an 'unreasonable application of' [clearly established Federal law] must be 'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." Woodall, 572 U.S. at 419 (quoting Lockyer v. Andrade, 538 U.S. 63, 75–764 (2003)) (alteration added). "Rather, '[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Woodall, 572 U.S. at 419-420 (quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).

When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary. Richter, 562 U.S. at 99 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). That presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely. Richter, 562 U.S. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

"Where a state court's decision is unaccompanied by an explanation, the habeas

petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. "This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." Id. In such a situation, the habeas court "must determine what arguments or theories . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## III.   DISCUSSION

### A.  Apprendi/Blakely Claim

In his first ground for relief, Petitioner claims that he was improperly sentenced for a Class BI felony instead of a Class B2 felony.  (§ 2254 Pet. 5, Doc. No. 1.)  Based upon the claim raised before the NCCOA and the record at trial, Petitioner's claim appears to be that the issue of whether he was to be sentenced for a Class B1 or B2 felony should have been submitted to the jury for a special verdict and that the trial judge exceeded his statutory authority by sentencing him as a Class BI felon in the absence of the special verdict.  The NCCOA denied this claim on the merits; the issue appears to have been a matter of first impression for the court.  See Lail, 795 S.E.2d at 406-411.

In Apprendi v. New Jersey, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). "[T]he 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washinton, 542 U.S. 296, 303 (2004) (citing Ring v. Arizona, 536 U.S.

8

584, 602 (2002) (" 'the maximum he would receive if punished according to the facts reflected in the jury verdict alone' " (quoting Apprendi, 530 U.S. at 483)); Harris v. United States, 536 U.S. 545, 563 (2002) (plurality opinion) (same); cf. Apprendi, 530 U.S. at 488 (facts admitted by the defendant)). "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely, 542 U.S. at 303-304. "When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, . . . and the judge exceeds his proper authority." Id. at 304 (citation and internal quote omitted).

In conducting its analysis, the Court must first look to the statute at issue – N.C. Gen. Stat. § 14–17. On direct appeal, Petitioner argued that amended N.C. Gen. Stat. § 14–17 requires the jury to specify in every instance whether depraved-heart malice supported its verdict finding an accused guilty of second-degree murder. See Lail, 795 S.E.2d at 406. The NCCOA disagreed.

In North Carolina, malice is an essential element of second-degree murder. Id. at 407 (citation omitted). North Carolina recognizes at least three malice theories:

> (1) "express hatred, ill-will or spite"; (2) commission of inherently dangerous acts in such a reckless and wanton manner as to "manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief"; or (3) a "condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification."

Id. (quoting State v. Coble, 527 S.E.2d 45, 47 (2000) (citation omitted)). "The second type of malice [is] commonly referred to as 'depraved-heart' malice[.]" Id. (quoting State v. Fuller, 531 S.E.2d 861, 864 (2000) (citation omitted)).

9

Prior to its amendment N.C. Gen. Stat. § 14–17 classified all second-degree murders, regardless of malice theory, as Class B2 felonies. See id. (citing N.C. Gen. Stat. § 14–17(b) (2011) ("[A]ny person who commits [second-degree] murder shall be punished as a Class B2 felon."). In 2012, the General Assembly amended this statute, reclassifying second-degree murder as a Class B1 felony, except under two situations where it would remain a Class B2 felony. N.C. Gen. Stat. § 14–17(b) (2015). As is relevant here, one of the exceptions is for depraved heart malice. See id. § 14–17(b)(1).

As a matter of statutory interpretation, the NCCOA held that amended § 14–17(b) does not always require a jury to specify whether depraved-heart malice theory supported its conviction for second-degree murder. Lail, 795 S.E.2d at 408. The NCCOA explained:

> Since only the second malice form recognized by judicial law, depraved-heart malice, was codified as mandating B2 punishment, it is clear the legislature intended a conviction based on the first or third malice forms to be treated as B1 second-degree murder. Logically, then, in a situation where no evidence is presented that would support a finding that an accused acted with depraved-heart malice, specification of malice theory would not provide clarity for sentencing purposes; it would be inferred from a general verdict that the jury found the accused guilty of B1 second-degree murder.

Id.

Thereafter, the NCCOA addressed Petitioner's claim that because the evidence presented at trial may have supported a finding that he acted with depraved-heart malice, the trial court improperly sentenced him as a B1 felon based on the jury's general verdict. Id. Applying Blakely, the NCCOA concluded that "there is simply no evidence which would have supported a finding of depraved-heart malice or an instruction on that theory." Lail, 795 S.E.2d at 409.

> When considering the evidence presented and the instruction given, we conclude that there was no ambiguity in the jury's general verdict. No evidence presented would have supported a finding that defendant acted with B2 depraved-heart malice. The evidence presented supported only B1 theories of malice and the jury

10

was instructed only on those theories. Therefore, although the jury was not instructed to answer under what malice theory it convicted defendant of second-degree murder, it is readily apparent from the evidence presented and instructions given that the jury, by their verdict, found defendant guilty of B1 second-degree murder.

Id. at 410.

Whether amended § 14–17(b) always requires a jury to specify whether depraved-heart malice theory supported its conviction for second-degree murder is a question of state law, and this Court may not "reexamine state-court determination on state law questions," McGuire, 502 U.S. at 67-68. Accordingly, this Court is bound by the NCCOA's determination that "in a situation where no evidence is presented that would support a finding that an accused acted with depraved-heart malice, . . . it would be inferred from a general verdict that the jury found the accused guilty of B1 second-degree murder," Lail, 795 S.E.2d at 408. See McGuire, 502 U.S. at 67-68. This Court, then, may only consider whether the NCCOA reasonably applied Apprendi, Ring, Blakely, et. al, when it determined that there was no evidence that would have supported a finding of depraved-heart malice or an instruction on that theory.

At sentencing, the issue arose as to whether Petitioner should be sentenced as Class B1 or B2 felon. In deciding to sentence him as a Class B1 felon, the trial court reasoned:

[R]eading the statute . . . there would have to be some evidence that would allow some reckless and wanton manner theory to have been addressed by the jury in this case. The jury was given malice in the form of . . . the use of a deadly weapon, which is certainly not a reckless and wanton manner-type argument. So . . . the Court is going to find . . . based on the evidence in this particular case that there was not any evidence to suggest that this act, while it may be based on an inherently dangerous act, was done in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberate mental mischief. So . . . the Court is going to conclude that based on the evidence in this case, the jury instructions that were given and the findings of the jury . . ., that this is a B-1 second-degree murder.

Lail, 795 S.E.2d at 406.

11

Lail was indicted for first-degree murder, and the State proceeded under a deadly weapon implied malice theory, which falls into the third malice category: that "condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." Id. at 409 (citation and internal quote omitted). Under North Carolina law, "the third type of malice is established by 'intentional infliction of a wound with a deadly weapon which results in death.'" Id. (quoting State v. Coble, 527 S.E.2d 45, 47 (2000) (citation omitted)). "A butcher knife is a deadly weapon." Lail, 795 S.E.2d at 410.

The NCCOA found the following facts: 1) the State introduced evidence that Petitioner repeatedly slashed Brian's neck with a butcher knife, one large cut severing Brian's right internal jugular vein, proximately causing his death; 2) Petitioner wholly denied cutting Brian's neck with a knife and blamed Huntly; 3) Petitioner never specifically rebutted deadly weapon implied malice nor advanced a depraved-heart malice theory argument; 4) Petitioner never requested that the judge instruct the jury on depraved-heart malice; and 5) the trial judge submitted the charge under an express malice and deadly weapon implied malice theory and elected not to instruct on a depraved-heart malice theory. See id. A state court's factual findings are presumed to be correct absent clear and convincing evidence that they are not correct. See § 2254(e)(1). Petitioner, who bears the burden here, has not offered or identified any clear and convincing evidence that the NCCOA's findings of fact are erroneous.

Petitioner also has not produced or directed this Court to evidence in the record that may have allowed the jury to find B2 depraved-heart malice. Accordingly, he has failed to demonstrate that the NCCOA unreasonably applied Apprendi, Ring, Blakely, et al, when it concluded that the trial court did not exceed its authority under the statute when it sentenced Petitioner as a Class BI felon. See § 2254(d)(1). Respondent is entitled to summary judgment

12

on this claim.

### B. Ineffective Assistance of Trial Counsel

In his second, third, and fourth grounds for relief, Petitioner claims trial counsel rendered ineffective assistance by failing during jury selection to remove jurors Petitioner believed might be biased because they had friends or family who were murdered (§ 2254 Pet. 6); failing to interview and/or call witnesses Petitioner asserts could have provided evidence to impeach Mark Huntley's testimony (§ 2254 Pet. 6-7, 8, 10); and failing to file a motion for a change of venue (§ 2254 Pet. 10). According to Respondent, Petitioner raised all these claims in his MAR and in his certiorari petition in the NCCOA. The Superior Court summarily denied the claims on the merits.

Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts requires a petitioner to identify all the grounds for relief available to him and to state the facts that support each ground for relief. Rule 2(c), 28 U.S.C.A. foll. § 2254. Petitioner has failed to state any facts in his § 2254 to support these grounds for relief. Instead, he directs the Court to what he asserts is a copy of his original hand-written MAR, see § 2254 Pet. (Doc. No. 1) at 7, 8, 10, 146-180. Consequently, Petitioner has failed to comply with Rule 2(c) of the Rules Governing Section 2254 Cases.

While pro se pleadings are held to a less stringent standard than those drafted by attorneys, see Erickson v. Pardus, 551 U.S. 89, 94 (2007); King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016), the liberal construction requirement does not mean that the Court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court, see Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990); see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) (outlining pleading requirements under Rule 8 of the Federal Rules of

Civil Procedure for "all civil actions"). Petitioner has failed to allege facts in his Petition which set forth ineffective assistance of counsel claims. See Iqbal, 556 U.S. at 684. The Court notes further that Petitioner's MAR is, for the most part, unintelligible, see "Copy of Original Hand-written MAR," § 2254 Pet. at 146-180.

In his Response to the summary judgment motion, Petitioner alleges facts that he could have alleged in his habeas Petition. Nevertheless, the Court shall consider those factual allegations in its adjudication of these ineffective assistance of counsel claims as Petitioner was not given an opportunity to amend his Petition before Respondent filed the Motion for Summary Judgment.

### 1. Standard

A defendant seeking relief based on ineffective assistance of counsel must meet two components: "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> The court must evaluate the conduct from counsel's perspective at the time, and apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance, in order to eliminate the distorting effects of hindsight. In all cases, the petitioner's burden is to show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.

Porter v. Zook, 898 F.3d 408, 434 (4th Cir. 2018), cert. denied, 139 S. Ct. 2012 (2019) (quoting Christian v. Ballard, 792 F.3d 427, 443 (4th Cir. 2015) (citations and internal quotation marks omitted)).

In order to show prejudice, "the petitioner must . . . show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different.'" Richardson v. Branker, 668 F.3d 128, 139 (4th Cir. 2012) (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, and the likelihood of a different result must be substantial, not just conceivable[.]" Id. at 139–40 (citations, alteration, and internal quotation marks omitted) (emphasis in original). On habeas review, this Court's inquiry "is limited to whether the [state] court's ineffective assistance determination was contrary to or an unreasonable application of Supreme Court precedent or an objectively unreasonable factual determination." Williams v. Stirling, 914 F.3d 302, 312 (4th Cir. 2019), as amended (Feb. 5, 2019).

    **2. Jury Selection**

Petitioner claims trial counsel rendered ineffective assistance by failing during jury selection to remove jurors Petitioner believed might be biased because they had friends or family who were murdered. (§ 2254 Pet. 6). In his Response opposing the summary judgment motion, Petitioner identifies one juror – a Mr. Robusky – who, he asserts, counsel should have challenged for cause. See Pet'r's 2nd Resp. to Summ. J. Mot. at 1 (Doc. No. 13-3). According to Petitioner, Robusky stated during voir dire that he had been affected by the murders of friends. See id.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to a trial by an impartial jury. See U.S. Const. amend. VI; Irvin v. Dowd, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." (internal quotation marks omitted)); Turner v. Louisiana, 379 U.S. 466, 471–73 (1965).

When asked by the prosecutor during voir dire if he knew anyone who had been murdered, Mr. Robusky responded that he grew up in the "projects in East New York" and had

"numerous" classmates, friends, and co-workers who were murdered during that time. Trial Tr. Vol. I at 85:10-14, 85:24-86:2, Sept. 14, 2015 (Doc. No. 8-14). He also stated that in at least one of those cases, 15 years prior, he had to talk to police and go to court, but he was not asked what his role in the criminal proceedings was, and he did not elaborate on his own. See id. at 86:7-18. When asked whether, given those experiences, there was anything that would keep him from being fair and impartial to both sides, Mr. Robusky responded: "No. By no means; no." Id. at 86:19-24. He then stated that his experiences had been tempered by his 20 years as a paralegal. Id. at 87:3-7.15

When it was his turn to question Mr. Robusky, defense counsel asked whether having friends who had lost their lives had affected him, and Mr. Robusky responded that it had. See Trial Tr. Vol. 11 195:4-10, Sept. 15, 2015 (Doc. No. 8-14). Counsel then asked if he was comfortable sitting on a jury in a murder case, and Robusky responded in the affirmative. Id. at 195:11-14. According to Petitioner, when he asked why his attorney had not moved to strike Robusky for cause, his attorney responded, "I like him." Pet'r's 2nd Resp. to Summ. J. Mot. at 1 (Doc. No. 13-3).

"Counsel's actions during voir dire are presumed to be matters of trial strategy," Connor v. Polk, 407 F.3d 198, 207 n.5 (4th Cir. 2005) (internal quotations and citations omitted), and Petitioner has provided evidence that was the case at his trial – counsel had a positive impression of Robusky. Moreover, Petitioner does not allege that Robusky was dishonest during voir dire. See, e.g., McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (In order to obtain a new trial, a defendant "must first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause."). Nor has he alleged facts that would justify a finding of implied

bias. See Connor, 407 F.3d at 206 (Situations that would justify a finding of implied bias "exist only where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." (citation and internal quote omitted)). Finally, Petitioner has put forth no reason to believe there is a reasonable probability he would have been acquitted had Robusky been removed from his jury.

As such, Petitioner has not demonstrated that the state court's rejection of his ineffective assistance of counsel claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Richter, 562 U.S. at 103. In other words, he has not demonstrated that the state court applied Strickland unreasonably when it denied Petitioner's claim. Respondent is entitled to summary judgment on this claim.

### 3. Venue

Petitioner claims trial counsel was ineffective for failing to file a motion for a change of venue. See § 2254 Pet. at 10. In his second Response in opposition to the motion for summary judgment, Petitioner alleges he asked his attorney to move for a change of venue due to the amount of publicity about the trial. See Pet'r's 2nd Resp. to Summ. J. Mot. at 2 (Doc. No. 13-3). He alleges further that the trial court allowed jurors to determine their own impartiality regarding pre-trial publicity and that the court's voir dire was insufficient to determine prejudice. See id.

Under North Carolina law, a trial court must either transfer the criminal proceeding to another county in the prosecutorial district or order a special venire, if, "upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial

trial." N.C. Gen. Stat. § 15A-957. "To obtain a change of venue, a defendant must show a specific and identifiable prejudice against him as a result of pretrial publicity." State v. Rogers, 562 S.E.2d 859, 866 (N.C. 2002). In meeting this burden, "a defendant must show *inter alia* that jurors with prior knowledge decided the case, that defendant exhausted his peremptory challenges, and that a juror objectionable to defendant sat on the jury." State v. Robinson, 561 S.E.2d 245, 250–51 (N.C. 2002) (quotation marks, citation, and alterations omitted). Further, "[t]he determination of whether a defendant has carried his burden of showing that pre-trial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion." State v. Yelverton, 434 S.E.2d 183, 187 (N.C. 1993).

Petitioner has alleged that one juror spoke up and acknowledged reading about his case, but he provides no other details. For example, he does not indicate whether this person was a prospective juror who subsequently was struck or whether the person sat on his jury. He does not indicate whether this happened during voir dire or during the trial, and he does not state the degree to which the court or the attorneys questioned the individual about what s/he had read and how it may have affected that person's impartiality. Finally, Petitioner has not alleged that his attorney had exhausted all the defense's peremptory challenges or that a juror objectionable to the defense sat on the jury.

Furthermore, for a jury to be presumed partial because of pretrial publicity, the publicity must involve coverage that is almost irrefutably incriminating and proximate in time to the trial, or the publicity must disturb the trial proceedings. The publicity must rise to a level that renders court proceedings "a hollow formality." Rideau v. Louisiana, 373 U.S. 723, 726 (1963). As an initial matter, Petitioner does not allege any facts related to the quantity or quality of pre-trial publicity. See, e.g., id. at 724-726 (presuming prejudice where defendant's filmed confession

18

was repeatedly broadcast two months before his trial); Irvin v. Dowd, 366 U.S. 717, 725-726

(1961) (presuming prejudice where six months before his trial, defendant was the subject of a

"barrage of newspaper headlines, articles, cartoons and pictures," characterizing him as

"remorseless and without conscience" and reporting that he had confessed to six murders and

had offered to plead guilty to avoid the death penalty).

While he alleges that the media was given full access to the trial and that there was daily

reporting about the trial in newspapers and on the local news, Petitioner does not characterize the

coverage (e.g. informational, accurate, inaccurate, sensationalized, etc.).  Nor does he provide

any information about the atmosphere in the courtroom when media were present.  See, e.g.,

Estes v. Texas, 381 U.S. 532, 535–536 (1965) (presuming prejudice in a case of national

notoriety in which the press attended and televised pretrial hearings, undermining the

courtroom's atmosphere of decorum with obtrusive cables, wires, and microphones); Sheppard v.

Maxwell, 384 U.S. 333 (1966) (presuming prejudice in case of national notoriety involving

pervasive pretrial publicity characterizing Sheppard as the murderer and where reporters

broadcasted a staged inquest presided over by the coroner and prosecutor and attended by

hundreds of spectators; the press was a constant presence inside and outside the courtroom;

jurors' photographs were published; the jury visited the murder scene in the presence of

hundreds of reporters; the jury was not sequestered and was only admonished to avoid press

coverage during the trial).

In short, the state court could have concluded that had defense counsel moved for a

change of venue, there was not a reasonable probability the motion would have been granted.

See Strickland, 466 U.S. at 694.  Petitioner has not demonstrated that the state court's rejection

of his ineffective assistance of counsel claim "was so lacking in justification that there was an

19

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Richter, 562 U.S. at 103. In other words, he has not demonstrated that the state court applied Strickland unreasonably when it denied Petitioner's claim. Respondent is entitled to summary judgment on this claim.

### 4. Witnesses

Petitioner claims counsel was ineffective for failing to interview and/or call witnesses who Petitioner contends could have provided evidence to impeach Mark Huntley's trial testimony. (§ 2254 Pet. 6-7, 8, 10). In his second Response in opposition to the motion for summary judgment, Petitioner identifies those individuals as Maderkis Rollinson, Tabitha, Jessica, Kisha Fisher, Johnny Price, and Mark Huntley's brother, Ted, and cousin, Butch. See Pet'r's 2nd Resp. to Summ. J. Mot. at 4 (Doc. No. 13-3).

Petitioner asserts that Kisha Fisher, Johnny Price, Ted Huntley, and Butch could have impeached Mark Huntley's and Joyce Rick's testimony, but he fails to state how. Accordingly, the Superior Court reasonably could have concluded that under Strickland, trial counsel did not render ineffective assistance by failing to call these individuals as witnesses.

As for Tabitha and Jessica, Petitioner asserts they could have proved "why Huntley want[ed] to go to S.C. and took all his belongings" and could have impeached part of Huntley's testimony. Pet'r's 2nd Resp. to Summ. J. Mot. at 4. Petitioner does not state what these two women would have testified was Huntley's reason for going to South Carolina Apart from indicating their testimony would have impeached Huntley's, Petitioner does not argue why there is a reasonable probability he would have been acquitted had they testified. Again, the Superior Court reasonably could have concluded that under Strickland, trial counsel did not render ineffective assistance by failing to call these individuals as witnesses.

Finally, Petitioner asserts that Maderkis Rollinson could have impeached Clinton Rucker's testimony and proved that Ruckers and Huntley "had conspired together to come up with what was said in court in hopes of getting out themselves and lighter sentence in Huntley's case." Pet'r's 2nd Resp. to Summ. J. Mot. at 3. According to Petitioner, Rollinson was cellmates with Huntly, Ruckers, and a man named Norris Myers. Again, Petitioner does not provide any information about Ruckers' testimony or identify the part of Ruckers' testimony Rollinson could have impeached. He does not provide any information about how Rollinson would have testified. Nor does Petitioner argue why there is a reasonable probability he would have been acquitted had defense counsel called Rollinson to testify. As was the case with the other potential witnesses, the Superior Court reasonably could have concluded that under Strickland, trial counsel did not render ineffective assistance by failing to call Rollinson as a witness.

Petitioner has not demonstrated that the state court's rejection of his ineffective assistance of counsel claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Richter, 562 U.S. at 103. In other words, he has not demonstrated that the state court applied Strickland unreasonably when it denied Petitioner's claim. Respondent is entitled to summary judgment on this claim.

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment (Doc. No. 7) is **GRANTED**;

2. The Petition for Writ of Habeas Corpus (Doc. No. 1) is **DENIED**;

3. The Clerk of Court is directed to substitute Erik A. Hooks for Mike Slagel as Respondent in this action; and

4.  Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines

to issue a certificate of appealability as Petitioner has not made a substantial showing

of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell,

537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 474, 484

(2000) (holding that when relief is denied on procedural grounds, a petitioner must

establish both that the correctness of the dispositive procedural ruling is debatable,

and that the petition states a debatably valid claim of the denial of a constitutional

right).

**SO ORDERED.**

Frank D. Whitney
Chief United States District Court